Town of North Hempstead, Respondent, v Exxon Corporation, Appellant. (Action No. 1.)

Mobil Oil Corporation, Appellant, v Town of North Hempstead, Respondent. (Action No. 2.)

Second Department, March 24, 1980

APPEARANCES OF COUNSEL

*George A. Burrell* for Exxon Corporation, appellant.

*Chase, Rathkopf & Rathkopf (Arden H. Rathkopf* and *Daren A. Rathkopf* of counsel), for Mobil Oil Corp., appellant.

*Joseph A. Guarino, Town Attorney (Bruce W. Migatz* of counsel), for respondent.

**OPINION OF THE COURT**

O'CONNOR, J.

█ Local Law No. 1-1976 of the Town of North Hempstead expressly prohibits the installation and use of self-service gasoline stations in the town. The evidence adduced at trial fails to establish that the ordinance bears a rational relation to the goal of preventing fires and other casualties at gasoline stations. For this reason, we hold that the enactment of Local Law No. 1-1976 was an unlawful exercise of the town's police power.

Accordingly, the judgment in Action No. 1 should be reversed, on the law, Local Law No. 1-1976 declared unconstitutional and the permanent injunction vacated.

The judgment in Action No. 2 should be reversed, on the law, and Local Law No. 1-1976 declared unconstitutional.

I

Since 1974 the appellants Exxon Corporation (Exxon) and Mobil Oil Corporation (Mobil) have operated self-service gasoline stations in the respondent, the Town of North Hempstead (the town). Mobil operates a "full self-service" station at which customers dispense gasoline under the general supervision of a station attendant. Exxon operates a "partial self-service" station which provides separate dispensing islands for service by either a station attendant or a customer. At the more common "full service" stations the attendants dispense all the gasoline. Special Term's opinion explains the salient differences between "full service" and "self-service" gasoline stations *(Town of North Hempstead v Exxon Corp.,* 98 Misc 2d 194, 196-197):

"Relatively recent merchandising innovations in the retail sale of gasoline, adopted by Mobil, Exxon and most major oil companies, have included the development and installation of

dispensing units designed and intended to be used and operated by the retail customer who is invited to purchase gasoline, using his own labors in the dispensing process, usually at a cost per gallon which is less than that customarily charged to reflect the labors of the station owner, operator or employee.

"In an operation of the latter kind, as conducted by Mobil and Exxon generally, 'full service' is offered the customer at the dispenser; which is to say that the dispensing hose is removed from its position on the island unit and the pump activated by the station attendant, who depresses a lever to energize the pump, inserts the hose nozzle into the fill pipe opening and then applies manual pressure to the trigger mechanism of the hose handle to start the flow of gasoline. The need to apply constant pressure is obviated by a latch device on the handle which may be applied to the trigger to maintain a selected rate of flow and free the attendant to perform other tasks. Overfilling is prevented by the design of the handle/nozzle unit in that pressure from within the fill pipe or other receptacle will release the latch and trigger to stop all flow when the tank has reached or approached a point of full capacity.

"By contrast, the self-service gasoline dispensing unit, whether at a totally self-service station or at a hybrid facility that offers the customer a choice of full-service or self-service, requires that an attendant within the sales booth or service building on the premises first activate a console or module control to supply energy to the unit selected by the customer. The attendant's act of authorization then permits the customer to dispense gasoline in the customary fashion albeit that the self-service handle importantly lacks the latch-open device and necessitates constant manual pressure upon the trigger to maintain the flow of gasoline. Flow will automatically cease when the level within the tank or fill pipe reaches the nozzle, as in the case of the full-service nozzle mechanism, or when the preselected quantity or monetary limit of the sale fixed by the purchaser and registered by the attendant upon the interior control device is attained. At that point, the pump supplying the dispensing unit becomes deactivated, and power is restored only through reactivation of the dispensing unit by the attendant's manipulation of the control console or module."

Section 3.6(d) of the Nassau County Fire Prevention Ordi-

nance permits self-service stations and imposes certain safety requirements:

"(i) Gasoline, self-service dispensing units shall only be permitted at outdoor, above-grade locations.

"(ii) A trained attendant shall be on duty at the control panel whenever the station is open for business, and shall observe, supervise, and control dispensing operations.

"(iii) Smoking shall be prohibited in the dispensing area and signs reading 'No Smoking-Stop Your Motor' shall be conspicuously posted at the dispensing island, in clear view of the motorist.

"(iv) Dispensing operations shall not be permitted until the engine of the vehicle being serviced is shut off.

"(v) Only portable containers listed by a nationally recognized testing laboratory shall be filled by gasoline dispensing units.

"(vi) Emergency power control switches shall be clearly identified, and shall be capable of disconnecting power to all dispensing units. They shall be located at least twenty (20) feet from the nearest dispenser, but not more than fifty (50) feet from the most remote dispenser. The attendant shall be in a location whereby all dispensing units are clearly visible.

"(vii) Only dispensing nozzles of the self-closing type shall be permitted for self-service dispensing devices. There shall be no latch-open device on any self-service dispensing nozzle.

"(viii) Plans for the installation of self-service gasoline dispensing installations shall be submitted to the Fire Marshal for approval prior to commencement of installation.

"(ix) Dispensing devices that are in compliance with standards set by the Underwriters' Laboratories, Inc., or Factory Mutual Engineering Division, shall be deemed acceptable.

"(x) The number and type of fire extinguishers shall be provided as indicated on plans submitted to the Fire Marshal as required by paragraph (viii) above, and located in the vicinity of the emergency controls.

"(xi) An approved audible intercommunication system shall be required between the attendant and the dispensing area, and shall be maintained in proper operating condition."

Code 30 of the National Fire Protection Association also prescribes safety measures at self-service gasoline stations:

"7643. All self-service stations shall have at least one at-

tendant on duty while the station is open to the public. The attendant's primary function shall be to supervise, observe and control the dispensing of Class I liquids while such liquids are actually being dispensed.

"7644. It shall be the responsibility of the attendant to (1) prevent the dispensing of Class I liquids into portable containers not in compliance with 7620; (2) to control sources of ignition; (3) immediately handle accidental spills and fire extinguishers, if needed. Attendant or supervisor on duty shall be mentally and physically capable of performing the functions as assuming the responsibilities prescribed in this section."

Exxon's and Mobil's compliance with all of the above safety measures is undisputed.

On April 27, 1976 the Town Board of the Town of North Hempstead, after a public hearing and "in furtherance of [the] public health, safety, and welfare", enacted Local Law No. 1-1976 which, in pertinent part, provides:

"§ 29-19. Dispensing of Gasoline, Motor Fuels, or other Flammable Liquids.

"The installation and use of coin-operated, self-service or customer-operated dispensing pumps at gasoline service stations or automobile service stations is prohibited. Motor fuels, lubricants, or other flammable materials may only be sold, dispensed, or pumps operated by the station owner, operator, or qualified employee of the same."

The town commenced an action to enjoin Exxon from operating its self-service station (Action No. 1). Exxon interposed a counterclaim admitting the operation of a self-service station and seeking a judgment declaring Local Law No. 1-1976 unconstitutional and enjoining the town from enforcing it.

Mobil brought Action No. 2 to declare the ordinance invalid. The town moved to dismiss the complaint on the grounds of collateral estoppel and failure to state a cause of action. Special Term treated the motion as one for summary judgment and declared Local Law No. 1-1976 valid and constitutional, but enjoined the enforcement of the ordinance against Mobil's self-service station on the ground that the station had acquired a "prior use right".

Mobil appealed from that part of the order holding Local Law No. 1-1976 to be valid and constitutional and the town cross-appealed from that part of the order enjoining enforce-

ment of the ordinance. This court reversed Special Term, holding that it was error to treat the town's motion to dismiss as a motion for summary judgment and we directed a trial as to the validity of the ordinance as applied to Mobil (*Mobil Oil Corp. v Town of North Hempstead*, 59 AD2d 551).

Pursuant to an order of Special Term, the actions were tried jointly. The trial court subsequently found that Local Law No. 1-1976 was constitutional and valid and that the town was entitled to injunctive relief. Both Exxon and Mobil appeal.

## II

All legislative enactments are entitled to a presumption of constitutionality. The force of this presumption is elaborated in *Lighthouse Shores v Town of Islip* (41 NY2d 7, 11-12): "The exceedingly strong presumption of constitutionality applies not only to enactments of the Legislature but to ordinances of municipalities as well. While this presumption is rebuttable, unconstitutionality must be demonstrated beyond a reasonable doubt and only as a last resort should courts strike down legislation on the ground of unconstitutionality. The ordinance may not be arbitrary. It must be reasonably related to some manifest evil which, however, need only be reasonably apprehended. It is also presumed that the legislative body has investigated and found the existence of a situation showing or indicating the need for or desirability of the ordinance, and, if any state of facts known or to be assumed, justifies the disputed measure, this court's power of inquiry ends. Thus, as to reasonableness, plaintiffs in order to succeed have the burden of showing that 'no reasonable basis at all' existed for the challenged portions of the ordinance. (See *Matter of Van Berkel v Power*, 16 NY2d 37, 40; *I.L.F.Y. Co. v Temporary State Housing Rent Comm.*, 10 NY2d 263, 269; *Wiggins v Town of Somers*, 4 NY2d 215, 218-219; *Defiance Milk Prods. Co. v Du Mond*, 309 NY 537, 541.)"

The tendency of a disputed ordinance to arrest "some manifest evil" has been the analytical focus of many of the leading cases. In *Lighthouse Shores (supra)*, for example, an ordinance restricting the use of motor vehicles on Fire Island was upheld where expert testimony substantiated that vehicular traffic was disturbing the ecological balance on the island. In *Marcus Assoc. v Town of Huntington* (45 NY2d 501), an ordinance limiting the permitted uses of a building in a light industrial district was upheld since it was rationally designed to achieve

the goal of preserving the character of the district. In *Town of Huntington v Park Shore Country Day Camp of Dix Hills* (47 NY2d 61), an ordinance permitting private nonprofit clubs but not commercial enterprises to operate tennis courts in a residential district was upheld since there were characteristics of a business venture which potentially rendered its operation of tennis courts more burdensome to a residential neighborhood than the same activity conducted by a nonprofit club. In *Good Humor Corp. v City of New York* (290 NY 312) a provision of the city's administrative code prohibiting itinerant peddling was held invalid because the avowed object of the law—to protect rent-paying storekeepers from competition—was not an object which the city had the constitutional power to make effective and because the provision bore no reasonable relation to the public health or welfare.

Using the same analysis, two reported cases in this State have struck down ordinances purporting, respectively, to regulate and prohibit self-service gasoline stations. The ordinance in *Len's Amoco v Town of Gates* (97 Misc 2d 900) required two attendants to be on duty at self-service gasoline stations during working hours. One of the grounds on which the court invalidated the ordinance was that there was no "manifest evil" to be apprehended. While fire prevention was a permissible goal of a municipality, the evidence failed to establish that there was a patently dangerous condition. "The reasons supporting the ordinance were largely groundless speculation about what could happen if multiple contingencies occurred" *(Len's Amoco v Town of Gates, supra,* p 903). The court also found that the ordinance exceeded any reasonably apprehended necessity and thus was not reasonably related to the evil sought to be prevented.

The ordinance in *Oil City Discount Center v City of Yonkers* (53 Misc 2d 191), like the ordinance in the instant case, permitted only service station owners, lessees, operators or employees to dispense gasoline. It was amended subsequently to permit only those who obtained a certificate of fitness from the Bureau of Combustibles to dispense gasoline. The evidence showed that there had never been an accident at the station and that the manner in which the station was operated did not constitute a threat to the public health, safety or general welfare of the community. The court also questioned the efficacy of a test for a certificate of fitness. On these bases, the ordinance was invalidated.

## III

It is beyond dispute that the town may regulate the use of flammable substances (see Town Law, § 130, subd 5). The evidence in this case establishes that during the period between 1975-1977 there were no reported incidents of gasoline station fires anywhere in the Nation traceable to the use of self-service stations. This is a significant statistic since 48 States permitted self-service facilities, and, by 1978, self-service stations had captured 45% of the national market.

The town's key witness, Joseph Caruso, had owned a partial self-service station in Wantagh, New York, for six years. The substance of his testimony was that customers regularly violated the safety measures prescribed by statute and regulation. The thrust of the town's argument is that limiting the handling of a flammable commodity to a few experienced hands minimizes all risks associated with dispensing gasoline.

The town's position is compelling as an abstract concept. The chances of a casualty occurring where one or two attendants are dispensing gasoline are not as great as where several hundred customers per day are operating the pumps. Absent other evidence, the unrealized potential for more casualties at self-service facilities would sustain the prohibitive ordinance (see *Town of Huntington v Park Shore Country Day Camp of Dix Hills*, 47 NY2d 61, 67-68, *supra*).

Hypothetical foresight, however, must give way to contrary empirical proof. The evidence adduced indicates that there have been no reported casualties anywhere in the country attributable to self-service gasoline stations and certainly no evidence of casualties at the facilities involved in this case. This undisputed empirical proof demonstrates that any "manifest evil" associated with the dispensing of gasoline is not increased by the advent of self-service. Since the hazards to be protected against are no greater at self-service facilities, the ordinance prohibiting the facilities does not tend to decrease the hazards. Thus, Local Law No. 1-1976 bears no reasonable relation to the "manifest evil" of gasoline-related casualties.

## IV

For the above reasons, we hold that Local Law No. 1-1976 is unconstitutional. The judgments must be reversed.

LAZER, J. P., MANGANO and COHALAN, JJ., concur.

Two judgments of the Supreme Court, Nassau County, both entered February 22, 1979, reversed, on the law, without costs or disbursements, Local Law No. 1-1976 of the Town of North Hempstead is declared to be unconstitutional and the injunction issued against Exxon Corporation is vacated.